# EXHIBIT 3

Rzeczkowski v. Borrero, Not Reported in N.W. Rptr. (2023)

2023 WL 2762442
Only the Westlaw citation is currently available.

NOTICE: THIS OPINION IS DESIGNATED AS
UNPUBLISHED AND MAY NOT BE CITED
EXCEPT AS PROVIDED BY MINN. ST. SEC.
480A.08(3).

*This opinion is nonprecedential except as provided
by Minn. R. Civ. App. P. 136.01, subd. 1(c).*
Court of Appeals of Minnesota.

In re the Marriage of: Pawel Dominik
RZECZKOWSKI, petitioner, Appellant,
v.
Carolina Uribe BORRERO, Respondent.

A22-0954
|
Filed April 3, 2023

Hennepin County District Court, File No. 27-FA-19-6324

**Attorneys and Law Firms**

Robert W. Due, James R. Todd, DeWitt LLP,
Minneapolis, Minnesota (for appellant)

John DeWalt, Melissa Chawla, DeWalt, Chawla +
Saksena, LLC, Minneapolis, Minnesota (for respondent)

Considered and decided by Johnson, Presiding Judge;
Segal, Chief Judge; and Bryan, Judge.

**NONPRECEDENTIAL OPINION**

SEGAL, Chief Judge

*\*1* In this marital-dissolution dispute, appellant argues
that the district court erred by enforcing the terms of a
document purporting to dissolve and liquidate the marital
estate executed under Colombian law. Appellant also
challenges the district court's denial of spousal
maintenance, calculation of respondent's income for

child-support purposes, and denial of need-based attorney
fees. We affirm in part, reverse in part, and remand.

**FACTS**

Appellant-husband Pawel Rzeczkowski and
respondent-wife Carolina Borrero met at a retreat in New
York in the summer of 2010. Borrero was living in her
home country of Colombia, in an apartment in Bogota,
and Rzeczkowski was living in Newnan, Georgia, where
his parents lived, when the two met. The parties began a
romantic relationship shortly after meeting and, by
August 2010, Rzeczkowski moved to Bogota to live with
Borrero in her apartment. During the parties' time in
Colombia, Borrero experienced professional success as an
executive for Pfizer. Rzeczkowski was not employed, but
had recently received a Global Executive Masters in
Business Administration (MBA) through a joint program
of Columbia University and the London Business School.

In June 2011, the parties became engaged. Borrero was
excited to get married, but had serious concerns about
Rzeczkowski's "lack of employment and apparent
unwillingness to accept anything less than his ideal job."
Rzeczkowski's career aspiration was to pursue start-up
companies and, in his words, to "swing for the fences and
take risks by chasing unicorns (start-ups with
billion-dollar potential)." Rzeczkowski had also
accumulated a significant amount of student-loan debt
and had liquidated and spent his 401(k) assets accrued
from a prior job. Borrero thus wanted to protect her assets
from his creditors and from the uncertainty of whether he
would contribute fairly toward their financial futures.
And, at least according to Borrero, Rzeczkowski was also
interested in protecting his anticipated future assets from
being part of the marital estate.

Borrero consulted a Colombian family-law attorney, who
recommended that the parties enter into a series of
agreements to keep their assets and obligations separate.
Specifically, the attorney recommended that the parties
enter into three agreements under Colombian law: (1) a
prenuptial agreement so that none of their preexisting
assets or debts would become part of the marital estate;
(2) a marriage contract; and (3) an agreement to
immediately dissolve and liquidate the marital estate
following the marriage, a "dissolution and liquidation of
marital partnership" agreement (the DLMP). According to
the family-law attorney, these agreements would, under
Colombian law, allow the parties to enter into a legally
valid marriage, but would keep their finances and

property separate. Borrero offered evidence that these types of agreements are not novel under Colombian law; she submitted affidavits from two Columbian-law experts explaining that the agreements are specifically provided for under Colombian law.

*2 Borrero then spoke with her aunt, who is described by Borrero as a "well-known Colombian attorney." The aunt drafted the agreements based on the advice from the family-law attorney. To prepare the agreements, Borrero and Rzeczkowski needed to gather a number of documents, including bank statements and other information about their individual assets, investments, liabilities, and debts.

The parties signed the prenuptial agreement on September 30, 2011. Borrero's premarital assets, kept separate by the agreement, "included property worth 500,000 Colombian pesos, her real property, her vehicle, her investment accounts, her retirement savings account, and various savings and bank accounts." Rzeczkowski's premarital "assets included property worth 500,000 Colombian pesos and the balance of [a credit union account]." The parties were married on October 1, 2011. The DLMP was also signed by the parties. The DLMP is dated October 3, 2011; the parties' signatures, however, are not separately dated. The marriage records of the parties in Colombia show that a Colombian notary public executed the prenuptial agreement on September 30, 2011, and the DLMP on October 3, 2011.

In 2013, the parties moved to the United States at Rzeczkowski's request. Prior to the move, they consulted with multiple attorneys to ensure that the prenuptial and DLMP agreements would be enforceable in the United States. As part of that process, Rzeczkowski emailed an attorney based in New York City in December 2011 and indicated that one of the major concerns the parties had was "making our prenuptial agreement and separation of assets agreement legal in [the United States]."

Following the move to the United States, Borrero continued to primarily support the parties. The parties lived in New York and Borrero continued to work for Pfizer; Rzeczkowski built his professional network but was not employed. Borrero, however, lost her job at Pfizer and subsequently accepted employment at Brambles in Atlanta. The parties then moved to Atlanta and lived there for approximately three years.[1] Borrero worked at Brambles and then did consulting work for Coca Cola; Rzeczkowski continued to build his professional network and had intermittent employment at startup companies. Rzeczkowski received some income from a few of the startup companies, but received no

compensation from others. In March 2015, while the parties lived in Atlanta, Borrero gave birth to twins.

In 2017, Borrero accepted employment at Cargill and the parties moved to Minnesota. Rzeczkowski worked at Thrivent Financial for approximately six months until December 2018, when he lost his position due to changes in management at Thrivent. He earned approximately $130,000 during his six months with Thrivent. Rzeczkowski remained unemployed between December 2018 and the dissolution trial in 2022. Borrero also lost her position at Cargill in 2018, but has worked on various consulting projects to earn income since losing that position. Despite Borrero's position changes, she has continually earned a "substantial income" and has considerable financial assets. The parties' homestead and vehicles are titled solely in Borrero's name.

In September 2019, Rzeczkowski petitioned for dissolution of marriage. The parties both filed motions for temporary relief. In August 2020, the district court established a temporary parenting-time schedule and ordered Borrero to pay Rzeczkowski $2,500 per month in financial support and to pay the mortgage, insurance, and other costs of the homestead and to pay the loans and insurance for their vehicles, along with their mobile phone bills, among other expenses. In doing so, the district court noted that "[t]he financial disparity between the parties is large" and that Borrero had "significant financial assets." In contrast, the district court noted that Rzeczkowski had "limited financial assets" but had "shown some capacity to obtain limited employment." The district court ordered that the parties "engage in a good faith effort to become employed and earn income" and expressed its concern that Rzeczkowski not engage in "freeriding" while receiving temporary financial support from Borrero.

*3 During the dissolution proceedings, Borrero brought a motion to enforce the prenuptial agreement and the DLMP. She argued that, based on the DLMP, the vast majority of the assets acquired during the marriage—including the homestead, vehicles, and savings—were her nonmarital assets. Rzeczkowski moved the district court to declare the DLMP invalid, arguing that he did not understand the ramifications of the document at the time and that it was invalid under Colombian and Minnesota law. The district court received submissions on the issue, including opinions from Borrero's two experts on Colombian law and one from a Colombian law expert offered by Rzeczkowski.

Based on those submissions, the district court ruled that the documents were enforceable as foreign judgments

under the principles of comity. The district court reasoned that, even if the documents were treated as contracts instead of foreign judgments, the principles of comity are still applicable under the "general rule that a contract made in one state will be enforced in another state." *Seamans v. Christian Bros. Mill Co.*, 68 N.W. 1065, 1066 (Minn. 1896).

After analyzing the evidence surrounding the parties' knowledge at the time the documents were signed, their reliance on the documents following the marriage, and the expert opinions, the district court rejected Rzeczkowski's arguments against enforcement. The district court found that there was "an abundance of circumstantial evidence that suggests that [Rzeczkowski] knew about the details of the Colombian Documents" and also that Rzeczkowski had "given [the] Court reason to believe that he would mislead the Court or distort facts in a self-serving manner." The district court further found that, because the DLMP was drafted to comport with Colombian law, the document could be enforced in Minnesota even though it did not comport with Minnesota's statute governing postnuptial agreements, Minn. Stat. § 519.11 (2022). Finally, the district court found that the DLMP did not violate the public policy against allowing a divorced spouse to become a "public charge."

The district court's findings of fact, conclusions of law, order for judgment, and judgment and decree finalizing the dissolution was issued a number of months later. Relevant to this appeal, the district court ordered that the assets and liabilities of the parties be allocated as provided in the prenuptial agreement and the DLMP. As a result, most of the property and assets at issue were deemed to be Borrero's nonmarital property. The district court ordered that the parties have joint legal and joint physical custody of the children, with equal parenting time, and ordered Borrero to pay Rzeczkowski $241 per month for child support. The district court also denied Rzeczkowski's requests for spousal maintenance and need-based attorney fees.

## DECISION

On appeal, Rzeczkowski challenges the district court's decision to enforce the terms of the DLMP on several grounds. First, he argues that the DLMP is not entitled to enforcement under the principles of comity as a foreign judgment because the DLMP is a contract, not a judgment. Second, he argues that the DLMP cannot be enforced because it is not valid under Colombian law for the following reasons: (1) the DLMP was signed by the

parties before they were married and, to be effective under Colombian law, it needed to be signed after their wedding; and (2) he was fraudulently induced to sign the DLMP and did not understand what he was signing because the DLMP was in Spanish, a language that he is not fluent in, and he was not offered a translator as required by Colombian law. Third, Rzeczkowski argues that the DLMP cannot be enforced under the principles of comity because enforcement would violate Minnesota's public policies against rendering a divorced spouse a public charge and against unconscionable contracts.

*4 In addition, Rzeczkowski challenges the district court's decision to deny him spousal maintenance, its calculation of Borrero's income for purposes of child support, and its decision to deny his claim for need-based attorney fees.

**I. The principles of comity are applicable, but we remand to the district court to analyze whether enforcement of the DLMP would violate the public policy against unconscionable contracts.**

*Applicability of the Principles of Comity*
We will address first the issue of whether the district court erred by applying the principles of comity in determining whether to enforce the terms of the DLMP. The application of comity

> is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws.

*Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895). "We review a district court's application of the principle of comity for an abuse of discretion." *In re Civ. Commitment of Hand*, 878 N.W.2d 503, 506 (Minn. App. 2016), *rev. denied* (Minn. June 21, 2016). A court may decline to recognize a foreign judgment as a matter of comity if it is "contrary to the public policy of Minnesota." *Nicol v. Tanner*, 256 N.W.2d 796, 802 n.11 (Minn. 1976).

At the outset, Rzeczkowski argues that the district court erred by applying the principles of comity because the DLMP is a contract, not a foreign judgment. We

disagree.[2] Under Colombian law, the DLMP is akin to a judgment even though it reflects an agreement reached between the parties. The DLMP was entered into based on specific provisions of Colombian law cited in the document. Those provisions require that, to be valid under Colombian law, the DLMP had to be recorded in a public deed executed by a "notary public." Thus, an agreement between the parties but not executed by a Colombian notary public or recorded in a public deed—a mere contract—would not be enforceable as a DLMP. And here, because the DLMP signed by the parties was recorded in a public deed executed by a Colombian notary public, it had greater legal significance than a contract.

Additionally, as the district court explained, notaries in Colombia are different from, and have more authority than, notaries in the United States. In support of her request to enforce the DLMP, Borrero submitted a petition to the notary office in the district in which the parties were married in Colombia. The petition requested information about the role of notaries public in Colombia and how their role and authority differed from notaries in the United States. The response from the acting head of the notary office explained that "to be appointed as Notary Public in Colombia, there is a set of requirements, related to professional experience and education, which are more demanding than those established for Circuit Judge appointments."[3] The response states that the requirements to be a "notary public" in Colombia include having a law degree and at least one of the following: six years of experience as a judge or university professor; ten years of legal practice; or four years as a notary, registrar or commissioner of public instruments. As to the scope of authority of a Colombian notary public, the acting head of the notary office stated that, under Colombian law, notaries are empowered to "authoriz[e] ... acts with declarations that constitute juridical situations, if there is agreement and no controversy between the parties." The response further explained that "these juridical situations shall have the same legal effects as if legally decreed in an adversarial or voluntary jurisdiction proceeding."

*5 The acting head of the notary office noted that, when the parties are in agreement on the terms, a marriage in Colombia may be legally dissolved when "processed before any Notary Public" and "formalized through a public deed." The response also stated that "Notaries Public are competent to authorize the dissolution and liquidation of the marital estate, even when, by mutual agreement, the parties decide to continue their marriage, with the civil effects of marriage still in force." The acting head of the notary office commented that the dissolution and liquidation of the marital estate in this case "was granted immediately after the marriage proceeding and in

definite manner dissolved and liquidated the marital estate." The response stated that "the spouses remain[ed] married but without marital partnership and without common or joint property."

As set out in the response summarized above, the role of a Colombian notary public is very different from a Minnesota notary public whose role is limited to verifying the identity of a person signing a document and that the signature is of that person. *See* Minn. Stat. § 358.55 (2022) (describing duties of a notarial officer). As described by the acting head of the notary office, the act of a Colombian notary public in granting documents like the DLMP is akin to a judicial officer issuing an order or decree based upon a stipulated agreement. We conclude that the DLMP is therefore comparable to a judgment and that the district court did not err in applying the principles of comity in determining whether the DLMP was enforceable.

*Validity of the DLMP under Colombian Law*

Rzeczkowski, however, argues that the district court nevertheless erred in enforcing the DLMP because the DLMP is not valid under Colombian law. Rzeczkowski contends that the DLMP is not valid because the document was signed by the parties before they were legally married. He bases his argument on the assertion that he and Borrero signed the DLMP on September 30, 2011—the day before their wedding. He argues that the DLMP was then "falsely notarized" on October 3, 2011, and is therefore invalid because at the time it was signed there was no marital estate to dissolve and liquidate.

As the district court found, however, the DLMP does not state that it was signed on October 3, 2011. Rather, the agreement states that the parties, in accordance with Colombian law, "proceed to dissolve and liquidate their marital partnership without any property borne by the partnership *at the date of execution* of this public instrument." (Emphasis added.) The date listed on the agreement is October 3, 2011, the date the DLMP was executed by the notary public and the public deed was recorded. The district court's finding on this issue is supported in the record by Borrero's two experts on Colombian law who opined that the DLMP was executed as of October 3 and is valid and enforceable under Colombian law.[4] We therefore discern no error by the district court in its finding that there was no falsification by the notary public, and in its determination that the DLMP is valid under Colombian law because it became effective, according to its terms, as of October 3,

2011—after the parties were married.

*Claim of Fraudulent Inducement and Failure to Offer a Translator*

**\*6** Rzeczkowski further argues that he was fraudulently induced into signing the document because it was in Spanish and he did not fully understand the consequences of entering into the document. *See Nicol*, 256 N.W.2d at 802 (noting that one of the requirements to recognize a foreign judgment is that "there is nothing to show ... fraud in procuring the judgment" (quotation omitted)). He also asserts that he was not offered a translator, as required by Colombian law, despite the fact that he was not fluent in Spanish. The district court rejected these arguments based on credibility determinations, and we defer to those determinations. *Sefkow*, 427 N.W.2d at 210.

The district court thoroughly analyzed the evidence surrounding Rzeczkowski's knowledge about and understanding of the terms of the DLMP, including emails with attorneys prior to entering into the agreements, email exchanges with attorneys only months later in preparation for the parties' return to the United States, and other communications in which the DLMP was discussed. The district court determined that not only was Rzeczkowski aware of the consequences of entering into the agreements, but that Rzeczkowski's "statements lack reliability, consistency with other facts, and are permeated with [Rzeczkowski's] self-interest to use the [DLMP] when it suits him and disavow it when it does not." The district court determined that Rzeczkowski demonstrated bad faith during the proceedings relating to his knowledge of the DLMP. And despite Rzeczkowski's assertion that he was not offered a translator, the district court found "there is credible evidence that he was offered a translator." Specifically, the record contains a sworn statement from the acting head of the notary office in Colombia averring that the notary public who authorized the DLMP asked Rzeczkowski if he needed a translation or for the agreements to be read in English, that he declined that offer, and that he indicated he understood the agreements. Accordingly, we discern no error in the district court's findings that the DLMP was valid under Colombian law.[5]

*Public-Policy Exception*
Finally, Rzeczkowski argues that the DLMP should not

be recognized as a matter of comity because the terms of the DLMP are such that they would violate the public policy of Minnesota. A court may decline to recognize a foreign judgment as a matter of comity if it would be "contrary to the public policy of Minnesota" to enforce that judgment. *Nicol*, 256 N.W.2d at 802 n.11.

Rzeczkowski argues that the DLMP violates Minnesota's public policy because enforcement of the document would render him a public charge. *See Abbott v. Abbott*, 282 N.W.2d 561 (Minn. 1979). In *Abbott*, a party petitioned for modification of spousal maintenance on the ground that his former spouse was living with and being supported by a new romantic partner. *Id.* at 564. In reviewing the district court's decision to modify maintenance, the supreme court observed: "It is in the public interest that [maintenance] be paid, since without such a postdivorce provision for support, there is a substantial likelihood that a divorced spouse will become a public charge." *Id.* at 565. Rzeczkowski argues that enforcement of the DLMP would similarly render him a public charge because under the agreements nearly all of the property acquired during the marriage would belong solely to Borrero and Rzeczkowski would be unable to support himself. But the district court determined that Rzeczkowski is capable of supporting himself and meeting his reasonable monthly expenses through appropriate employment. As will be discussed in greater detail in the next section of the analysis, the record supports this determination. Enforcement of the DLMP therefore would not render Rzeczkowski a public charge, and his public-policy argument on this ground fails.

**\*7** Rzeczkowski, however, also argued to the district court—although not articulated as clearly as his public-charge argument—that enforcement of the DLMP would be unconscionable. There is no Minnesota caselaw addressing whether the public-policy exception to the application of comity encompasses unconscionability. Minnesota does, however, have a policy against enforcing unconscionable contracts.[6] *See Holland v. Sheehan*, 122 N.W. 1, 3 (Minn. 1909) ("Public policy requires of courts of equity protection from unjust and unconscionable bargains ...."), *abrogated in part by Maslowski v. Prospect Fundings Partners LLC*, 944 N.W.2d 235 (Minn. 2020); *see also Kauffman Stewart, Inc. v. Weinbrenner Shoe Co.*, 589 N.W.2d 499, 502 (Minn. App. 1999) ("If a court determines that a contract contains an unconscionable clause, it may refuse to enforce the contract, enforce it without the offending language, or limit application of the unconscionable clause to avoid any unconscionable result." (quotation omitted)). And, in the context of antenuptial agreements, our supreme court has held that such agreements "must be fair, both

Rzeczkowski v. Borrero, Not Reported in N.W. Rptr. (2023)

procedurally and substantively."[7] *Kremer v. Kremer*, 912 N.W.2d 617, 621 (Minn. 2018). The court stated that "[t]he common-law standard for substantive fairness is whether an agreements' terms are unconscionable or oppressive." *Id.* We also note that the legislature has expressed similar standards for postnuptial agreements in subdivision 1a of Minn. Stat. § 519.11. That statute provides that to be "valid and enforceable," the agreement must be "procedurally and substantively fair and equitable."[8] Minn. Stat. § 519.11, subd. 1a.

Consequently, we can presume that there is a clear policy in this state against the enforcement of unconscionable postnuptial agreements. And because "[c]omity is not a formal rule but rather an informal policy of deference," we also conclude that it is valid to consider whether the DLMP is unconscionable regardless of whether Colombia would judge the DLMP against the same standard. *Medtronic, Inc. v. Advanced Bionics Corp.*, 630 N.W.2d 438, 449 (Minn. App. 2001). As such, we conclude that the public-policy exception to the application of comity encompasses a prohibition on the enforcement of unconscionable provisions in postnuptial agreements.[9]

**\*8** The district court here, however, did not address whether the provisions of the DLMP are unconscionable. The district court limited its public-policy analysis to whether enforcement of the DLMP would render Rzeczkowski a public charge, which in fairness to the district court was Rzeczkowski's most clearly articulated claim. We conclude that it is therefore appropriate to remand this issue to the district court to determine whether enforcement of the DLMP would be unconscionable, and we refrain from expressing any opinion on the merits of this question at this time.

## II. The district court did not err in determining that Rzeczkowski is not entitled to temporary spousal maintenance.

Rzeczkowski next argues that the district court should have awarded him temporary spousal maintenance.[10] We review a district court's spousal-maintenance decision for an abuse of discretion. *Dobrin v. Dobrin*, 569 N.W.2d 199, 202 (Minn. 1997). A district court abuses its discretion if it reaches a "conclusion that is against logic and the facts on record." *Curtis v. Curtis*, 887 N.W.2d 249, 252 (Minn. 2016) (quoting *Dobrin*, 569 N.W.2d at 202). The court reviews legal questions de novo, but reviews findings of fact for clear error. *Kampf v. Kampf*, 732 N.W.2d 630, 633 (Minn. App. 2007), *rev. denied* (Minn. Aug. 21, 2007). Findings are clearly erroneous if

"they are manifestly contrary to the weight of the evidence or not reasonably supported by the evidence as a whole." *Id.* (quotation omitted).

A district court may order spousal maintenance if it finds that the spouse requesting maintenance either:

> (a) lacks sufficient property ... to provide for reasonable needs of the spouse considering the standard of living established during the marriage ... or

> (b) is unable to provide adequate self-support, after considering the standard of living established during the marriage and all relevant circumstances, through appropriate employment.

Minn. Stat. § 518.552, subd. 1 (2022); *see also Lyon v. Lyon*, 439 N.W.2d 18, 22 (Minn. 1989) (stating that an award of spousal maintenance requires a showing of need). The district court may award spousal maintenance "in amounts and for periods of time, either temporary or permanent," as it deems just after considering "all relevant factors." *Id.*, subd. 2 (2022).

"If a party requests spousal maintenance, a district court must engage in a two-step analysis." *Madden v. Madden*, 923 N.W.2d 688, 695 (Minn. App. 2019). The first step is to consider "whether the party seeking maintenance has demonstrated a showing of need." *Id.* (quotation omitted). A party demonstrates a showing of need if "the party is unable to provide for his or her reasonable expenses through employment income or investment income or a combination of both." *Id.* If a party makes the threshold showing of need, the second step is for the district court to consider the appropriate amount and duration of maintenance. *Id.*

Rzeczkowski argues that the district court abused its discretion in denying his request for temporary spousal maintenance because the district court "did not make detailed findings reflecting consideration of the factors listed in Minn. Stat. § 518.552, subd. 2," which sets forth relevant factors to be considered when determining the amount and duration of maintenance. But such consideration is to be undertaken *only if* the party requesting maintenance first makes a showing of need that demonstrates "the party is unable to provide for his or her reasonable expenses through employment." *Id.*; *see also* Minn. Stat. § 518.552, subd. 1(b). Here, the district court determined that Rzeczkowski is capable of providing for his reasonable expenses through employment. The district court thus determined that Rzeczkowski failed to make the threshold showing of need and as such the court was not required to make findings on the second step of the analysis. *Cf. Tuthill v. Tuthill*, 399 N.W.2d 230, 232 (Minn. App. 1987) (ruling,

in the maintenance-modification context, that the movant's failure to show the statutorily required change of circumstances was fatal to the motion to modify maintenance, and hence that "it is not necessary for the trial court to make findings regarding any other factors addressed in the statute"). Accordingly, we turn our attention to a review of the district court's determination that Rzeczkowski is capable of meeting his reasonable monthly expenses through employment.

**\*9** Rzeczkowski was unemployed at the time of trial and submitted an itemized list of expenses totaling $4,999 per month. In his written final argument, Rzeczkowski indicated that in addition to the listed expenses he also had a monthly expense of $300 for his health-insurance premium. He requested spousal maintenance in the amount of $4,550 per month for a period of five years and argued that, "[t]ogether with child support, this amount of temporary spousal maintenance will afford [Rzeczkowski] the opportunity to meet his budget of approximately $5,300 per month." The district court denied Rzeczkowski's request for temporary spousal maintenance after determining that Rzeczkowski could and should be able to obtain appropriate employment that would allow him to meet his monthly budget.

In the initial order granting temporary relief issued in August 2020, the district court ordered "[b]oth parties [to] engage in a good faith effort to become employed and earn income." The initial order also required Borrero to pay temporary financial support to Rzeczkowski in the amount of $2,500 per month in addition to paying for the mortgage, property taxes, homeowner's insurance, and utilities for the homestead, along with covering the vehicle payments, auto-insurance premiums, and mobile-phone bills for her and Rzeczkowski.[11]

In an attempt to demonstrate that he had conducted a serious job search during the year and a half between the initial order and trial, Rzeczkowski submitted an exhibit indicating that he had applied for 55 jobs between July 2020 and December 2021, an 18-month period. Approximately two-thirds of the total applications were submitted in just two months—March and November 2021—and there were several months when Rzeczkowski seemingly did not apply for any jobs. Moreover, many of the positions were high-level director or vice-president positions at large companies, and Rzeczkowski received interviews for only two positions, neither of which resulted in an offer of employment.

The district court found that, in the period of time between the initial order and trial, Rzeczkowski should have been able to gain employment and that he "has not shown credible evidence of his attempts to gain sufficient employment." The district court found that Rzeczkowski "is capable of gaining employment, that no further education or training would be necessary, and that his history of employment supports this position." The district court then explicitly stated that it "would like to emphasize the difference that exists between sufficient employment and [Rzeczkowski's] preferred employment."

We discern no clear error in the district court's findings. The record shows that Rzeczkowski has an impressive educational background, including an MBA from Columbia University and the London Business School. After receiving his joint degree, instead of seeking employment with established companies, Rzeczkowski pursued start-up opportunities in hopes of finding a "unicorn" that never materialized. Rzeczkowski did work for Thrivent Financial in 2018 and was able to make approximately $130,000 in his six months of employment there. And Rzeczkowski received vocational placement coaching while they were living in Minnesota, paid for by Borrero's employer.

The record also contains testimony from a vocational expert retained by Borrero who reviewed Rzeczkowski's education and employment history. The expert testified that, in his opinion, Rzeczkowski was immediately employable and capable of earning $100,000 to $125,000 per year.[12] This supports the district court's determination that Rzeczkowski is capable of obtaining suitable employment but, because he chooses to apply for only his ideal positions, is voluntarily unemployed.

**\*10** Rzeczkowski cites to *Carrick v. Carrick* as support for his argument that the district court denied spousal maintenance to punish him for failing to obtain employment during the proceedings. 560 N.W.2d 407 (Minn. App. 1997). But that case is thoroughly distinguishable. First, the district court in this case found Rzeczkowski voluntarily unemployed in the dissolution judgment only after the court had ordered him in the temporary order to engage in a "good faith" search for employment. There was no such temporary order to seek employment in *Carrick*. Second, "*Carrick* addressed only the period between the parties' separation and the dissolution judgment"; district courts "read *Carrick* too broadly" if they "apply [*Carrick*] to the post-judgment period." *Passolt v. Passolt*, 804 N.W.2d 18, 24 (Minn. App. 2011), *rev. denied* (Minn. Nov. 15, 2011). *Carrick* thus addresses a different question (need of a potential maintenance recipient to seek a job before entry of a dissolution judgment) in a different context and lacks persuasive weight here.

Rzeczkowski v. Borrero, Not Reported in N.W. Rptr. (2023)

Third, *Carrick* is also factually distinguishable from this case. In *Carrick*, the parties were married for more than 21 years. *Id.* at 411. The wife did not work outside of the home for the first ten years of the parties' marriage, but rather "was a full-time homemaker and caretaker" of the parties' child and the husband's three children from a prior marriage. *Id.* The wife then worked on a part-time basis for the last ten years of the marriage and continued her part-time employment after the parties separated. *Id.* The district court in *Carrick* awarded the wife spousal maintenance but did so only after imputing additional income to her. The district court imputed the income based on its determination that the wife "acted in bad faith by remaining intentionally underemployed" because she remained employed only in a part-time, instead of a full-time, status between the parties' separation and the dissolution of their marriage. *Id.* at 410.

In *Carrick*, this court reversed the imputation of additional income to the wife, noting that "[t]here is no authority for finding bad faith underemployment ... merely because a potential obligee has not yet rehabilitated when the record indicates the obligee has continued in the same employment and there is no evidence of an intent to reduce income for the purposes of obtaining maintenance." *Id.* at 410-11. This court went on to note that "the evidence indicated that [the wife] earned a reasonable income from [her] position, enjoyed working ... and was very committed emotionally to the job." *Id.* at 411.

Here, Rzeczkowski petitioned for dissolution of marriage after the parties had been married for just eight years. This is significantly less than the 21-year marriage in *Carrick*. And unlike the wife in *Carrick*, Rzeczkowski was not a "full-time homemaker and caretaker." The record is clear that both parties expected Rzeczkowski to work full-time outside the home. While both parties have been actively involved in the parenting of the twins, the parties had a live-in nanny from the time of the children's birth in March 2015 until the end of 2018. In the order granting temporary relief, the district court found that "[t]he totality of the evidence supports that the parties are equally responsible for the children's care rather than one party being the sole caretaker of the children." This further distinguishes the facts of this case from *Carrick*.

Finally, we note that this court observed in *Carrick* that the wife continued her pre-separation employment, earned a reasonable income, and was committed to her job, and there was no evidence that the wife had attempted to reduce her income to obtain maintenance. Here, the record supports that Rzeczkowski has limited his job search to his ideal jobs despite the district court's order in August 2020 that both parties engage in a good-faith effort to obtain employment. In that order, the district court also explicitly stated that "the Court is concerned that [Rzeczkowski's] motion for financial support may encourage freeriding." And in the final order denying Rzeczkowski's request for spousal maintenance, the district court found a "lack of evidence" that Rzeczkowski's "inability to be self-sufficient was not due to his unwillingness to gain employment."

*11 On this record, we discern no clear error by the district court in finding that Rzeczkowski was voluntarily unemployed and was capable of meeting his reasonable monthly expenses through suitable employment. Because the record supports the determination that Rzeczkowski did not demonstrate a need for spousal maintenance, the district court did not err in failing to make findings related to the duration and amount of maintenance. *See Tuthill*, 399 N.W.2d at 232.

### III. The district court did not err in calculating child support.

Rzeczkowski argues that the district court erred in calculating child support because it understated Borrero's income and overstated his own. Generally, the "determination of income must be based in fact and will stand unless clearly erroneous." *Newstrand v. Arend*, 869 N.W.2d 681, 685 (Minn. App. 2015) (quotation omitted), *rev. denied* (Minn. Dec. 15, 2015).

In calculating the parties' child-support obligations, the district court found that Borrero had a monthly income of $15,810 and that Rzeczkowski had a potential monthly income of $8,333 based on the lower end of the estimation made by Borrero's vocational expert. Rzeczkowski argues that both income determinations are clearly erroneous. The district court based its determination of Borrero's monthly income on her 2020 income of $189,724. Rzeczkowski argues that the district court should have instead found Borrero's annual income to be $350,920—the gross revenue of her business in 2021 minus the business expenses that she testified to at trial. Notably, in its general findings of fact on the parties' "income and expenses" the district court observed that Borrero's "gross earnings after business expenses in 2021 were approximately $350,920." This is significantly more than the $189,724 used by the district court to calculate child support.

However, the record as a whole persuades us that the

district court did not clearly err in determining Borrero's income for child-support purposes. As Borrero notes, the district court used the most recent full year of taxable income, whereas the $350,920 figure was based on an exhibit showing the gross revenue of the business that was prepared by Borrero—rather than reflecting information from tax documents—and her testimony about business expenses. Additionally, Borrero's income varies as she is now self-employed.[13] Prior to 2021, her prior three years of income were approximately $190,000; $160,000; and $131,000, with the district court selecting the highest level of income from the prior three years. And the revenue figure of $350,920 in 2021, which included her gross revenue of $385, 920 minus certain expenses, was an outlier from her recent earning history. Based on this record, we conclude that the district court did not abuse its discretion in opting to use Borrero's most recent full year of taxable income when calculating her child-support obligation.

**\*12** The record also supports the district court's determination that Rzeczkowski was capable of earning $100,000 per year, or $8,333 per month. As discussed above, the district court did not err in determining that Rzeczkowski was voluntarily unemployed. When such a finding is made, a district court "must" determine potential income based on one of three calculations, including "the parent's probable earnings level based on employment potential, recent work history, and occupational qualifications in light of prevailing job opportunities and earnings levels in the community." Minn. Stat. § 518A.32, subd. 2 (2022). Here, the district court determined that Rzeczkowski's potential income was $100,000 per year based on the testimony and evidence presented by Borrero's vocational expert. This evidence included a "labor market survey" that analyzed Rzeczkowski's employment history, educational qualifications, and employment opportunities in the area, and testimony on the same topics. Thus, the vocational expert's opinion, which the district court credited and relied on in computing Rzeczkowski's potential income, was based on the appropriate statutory factors. We therefore discern no clear error in the district court's imputation of income to Rzeczkowski.

**IV. We must remand to the district court to make additional findings on Rzeczkowski's request for need-based attorney fees.**
Finally, Rzeczkowski challenges the denial of his request for need-based attorney fees. We review an award of need-based attorney fees for an abuse of discretion. *See*

*Gully v. Gully*, 599 N.W.2d 814, 825 (Minn. 1999).

In a marriage-dissolution action, a district court "*shall* award attorney fees, costs, and disbursements in an amount necessary to enable a party to carry on or contest the proceeding," provided that the district court finds:

(1) that the fees are necessary for the good faith assertion of the party's rights in the proceeding and will not contribute unnecessarily to the length and expense of the proceeding;

(2) that the party from whom fees, costs, and disbursements are sought has the means to pay them; and

(3) that the party to whom fees, costs, and disbursements are awarded does not have the means to pay them.

Minn. Stat. § 518.14, subd. 1 (2022) (emphasis added).

Here, the district court found that the second and third statutory requirements were satisfied—Borrero has the ability to pay attorney fees and Rzeczkowski does not. But the district court declined to award Rzeczkowski need-based attorney fees based on the determination that an award of such fees was "not necessary for the good-faith assertion of [Rzeczkowski's] rights as [Rzeczkowski] has acted in bad faith during these dissolution proceedings." In doing so, the district court reiterated its findings from the order enforcing the DLMP that the district court "does not find [Rzeczkowski's] statements to be credible because he has given this Court reason to believe that he would mislead the Court or distort facts in a self-serving manner" and that Rzeczkowski's "statements lack reliability, consistency with other facts, and are permeated with [Rzeczkowski's] self-interest to use the economic divorce when it suits him and disavow it when it does not."

We first note that the district court's finding that Rzeczkowski acted in bad faith is based largely on the district court's assessment of Rzeczkowski's credibility. We defer to the district court's credibility determinations. *Sefkow*, 427 N.W.2d at 210. But we also note that the district court's finding relates solely to Rzeczkowski's assertion of rights regarding the validity and enforcement of the DLMP. As Rzeczkowski observes, that was not the only assertion of rights at issue during the proceedings. For example, the parties were unable to reach an agreement on legal custody of the children and argued that issue to the district court. The parties presented their own testimony and argument, participated in a custody evaluation, and the custody evaluator and an expert retained by Borrero also testified on the issue. Borrero

**Rzeczkowski v. Borrero, Not Reported in N.W. Rptr. (2023)**

argued that she should be granted sole legal custody of the children; Rzeczkowski requested joint legal custody. The district court ultimately agreed with Rzeczkowski and awarded the parties joint legal custody. Thus, some of the claimed attorney fees relate to assertions of rights that were made in good faith.

**\*13** On this record, we must remand to the district court to make additional findings on Rzeczkowski's request for need-based attorney fees. As discussed above, a district court *shall* award need-based attorney fees if the three statutory criteria are met. Minn. Stat. § 518.14, subd. 1. The two criteria relating to ability to pay are met here; the only criterion at issue is whether "the fees are necessary for the good faith assertion of the party's rights in the proceeding and will not contribute unnecessarily to the length and expense of the proceeding." *Id.* Because the district court's finding that Rzeczkowski acted in bad faith relates solely to his assertion of rights regarding the Colombian documents, we must remand for additional

findings addressing whether an award of need-based attorney fees is necessary for Rzeczkowski's assertion of other rights that were made in good faith.

On remand, the district court may, in its discretion, reopen the record on either or both issues—whether the DLMP violates the public policy against unconscionable agreements and whether Rzeczkowski is entitled to an award of need-based attorney fees for the assertion of other rights that were made in good faith.

**Affirmed in part, reversed in part, and remanded.**

**All Citations**

Not Reported in N.W. Rptr., 2023 WL 2762442

Footnotes

1    Rzeczkowski's parents lived near Atlanta in Newnan, Georgia where Rzeczkowski was living when he met Borrero.

2    Borrero argues in the alternative that the principles of comity apply even if the DLMP is characterized as a foreign contract and not a judgment. The district court agreed. We do not, however, address this alternative argument because we conclude that the district court did not err in treating the DLMP as a foreign judgment.

3    This and the following quotes are from the official translation of the response to Borrero's petition to the notary office. The record also contains the original in Spanish that is signed by the notary.

4    While Rzeczkowski presented an affidavit from his own Colombian law expert opining that the DLMP is not valid because the parties signed the document before their marriage, the district court credited Borrero's experts. *See Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn. 1988) (stating that "[d]eference must be given to the opportunity of the trial court to assess the credibility of the witnesses"); *see also Straus v. Straus,* 94 N.W.2d 679, 680 (Minn. 1959) (stating that "[c]onflicts in the evidence, even though the presentation is upon affidavits, are to be resolved by the trial court"); *Knapp v. Knapp,* 883 N.W.2d 833, 837-38 (Minn. App. 2016) (citing this aspect of *Straus*).

5    We note that Rzeczkowski argues also that the DLMP is not enforceable because the DLMP does not comport with the procedural requirements of Minnesota's postnuptial contract statute set out in Minn. Stat. § 519.11. The district court, however, concluded that, because the DLMP is being enforced under the principles of comity as a foreign judgment, such failure does not of itself render the DLMP unenforceable if it was in compliance with the procedures required under Colombian law. We agree. *See Ramsey County v. Lee,* 770 N.W.2d 572, 576 (Minn. App. 2009) ("The general rule is that things done in one sovereignty in pursuance of the laws of that sovereignty are regarded as valid and binding everywhere." (quotation omitted)).

6    Under Minnesota precedent, "[a] contract is unconscionable if it is such as no [person] in [their] senses and not under delusion

would make on the one hand, and as no honest and fair [person] would accept on the other." *In re Est. of Hoffbeck*, 415 N.W.2d 447, 449 (Minn. App. 1987) (quotation omitted), *rev. denied* (Minn. Jan. 28, 1988).

7   While this and other cases cited in this opinion refer to "antenuptial" agreements and the DLMP is a stipulated postnuptial document, the distinction is not material for the purposes for which the cases are cited.

8   In citing Minn. Stat. § 519.11, we are not implying that the statute governs whether the DLMP should be enforced. Under the principles of comity, the DLMP is enforceable, subject only to the exceptions to the application of that doctrine, such as the public-policy exception. We cite Minn. Stat. § 519.11 only as an example of an expression of Minnesota's public policy. *See Holland*, 122 N.W. at 3 ("Constitutions and statutes are evidence of the general policy of a state; but when confronted with questions of general public policy ... the courts go beyond express legislation and look to the whole body of the law—statutory, common, and judicial decisions.").

9   We caution that, in recognizing the existence of a public policy against unconscionable postnuptial provisions in this context, we do not intend to accord courts with free rein to reject the clearly stated intentions of the parties. We note in this regard that "Minnesota has long recognized the validity of antenuptial agreements which altered statutory schemes regulating the disposition of marital property." *McKee-Johnson v. Johnson*, 444 N.W.2d 259, 265 (Minn. 1989), *overruled in part by Kremer v. Kremer*, 912 N.W.2d 617, 626 (Minn. 2018). The supreme court has cautioned that the mere fact that an agreement may divide marital property differently than the property-division statutes, does not render an agreement substantively unfair. *McKee-Johnson*, 444 N.W.2d at 268 n.8. "Indeed, one of the goals, if not the primary purpose, of an antenuptial agreement is to alter state-prescribed property rights which would otherwise arise on dissolution of marriage." *Id.* Thus, the fact that an agreement may result in a different or less favorable outcome than would otherwise have occurred in the absence of the agreement does not necessarily lead to the conclusion that the agreement is unconscionable.

10   Rzeczkowski made no request for permanent spousal maintenance.

11   Borrero also offered to pay to furnish Rzeczkowski's new living space.

12   Borrero's vocational expert also testified that an active job search typically involves applying for three to five positions per week, compared to Rzeczkowski's search that involved an average of about three applications per month. Additionally, the expert testified that many of the positions Rzeczkowski applied for were too high level given the gaps in Rzeczkowski's employment history. Rzeczkowski presented no vocational expert testimony.

13   The calculation of income for child-support purposes for individuals who are self-employed is generally governed by Minn. Stat. § 518A.30 (2022). Under that statute, a self-employed individual's income for child-support purposes "is defined as gross receipts minus costs of goods sold minus ordinary and necessary expenses required for self-employment or business operation." Minn. Stat. § 518A.30. Neither the district court nor the parties cite to this statute, and we decline to consider it on appeal. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (stating that appellate courts do not address questions not previously presented to and considered by the district court). In doing so, we note that Borrero was recently self-employed at the time of the district court proceedings and that the record contains only basic estimates of her business's revenue and expenses, rather than the more thorough documentation contemplated by the statute.

**Rzeczkowski v. Borrero, Not Reported in N.W. Rptr. (2023)**

End of Document                                    © 2026 Thomson Reuters. No claim to original U.S. Government Works.